United States District Court
Southern District of Texas
**ENTERED**
March 24, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EQUISTAR CHEMICALS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-3757 |
| | § | |
| INDECK POWER EQUIPMENT CO., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case arises from a contract and warranties for two industrial steam boilers.  Equistar Chemicals, L.P. contracted with Indeck Power Equipment Company to obtain the steam boilers, related instrumentation and equipment, and technician services for installation and start-up at Equistar's Illinois plant.  Equistar and Indeck planned on 36 days for Indeck's service technician to do the necessary work.  Instead, it took two Indeck service technicians working for a total of 186 days to identify, then help correct, defects in the boilers.  That work increased Equistar's costs and nearly caused its plant to shut down.  In 2019, Equistar sued Indeck, asserting claims for breach of warranty, breach of contract, and negligence, based on alleged equipment-design and manufacturing defects and negligent service-technician work.  Equistar seeks its out-of-pocket damages, not lost profits or other consequential losses, and attorneys' fees.

In February and March 2021, the court conducted a six-day bench trial by Zoom.[1]  The court's detailed findings and conclusions are set out below.  In summary, based on the pleadings,

---

[1]  The court finds that the technology allowed a clear, efficient, and thorough presentation of the witnesses and the relevant evidence, and that the remote presentation of the proceedings did not infringe on any rights of either party or cause any prejudice.

briefs, exhibits, testimony, arguments of counsel, and applicable law, the court finds and concludes as follows:

- Indeck is liable for breach of warranty for supplying Equistar with a defective forced-draft fan, fuel-gas skid, and two water bridles, resulting in $313,861 in damages to Equistar;

- Indeck is not liable for breach of warranty for supplying Equistar with boilers that vibrated excessively, because Equistar did not provide timely written notice to Indeck under the Master Contract;

- Indeck is not liable for professional negligence for designing boilers that vibrated excessively, because Equistar's negligence claim is precluded by the economic-loss rule;

- Indeck is liable for breach of contract for providing Equistar with inefficient start-up services, because one Indeck service technician's work had to be substantially redone and two service technicians had to spend substantial time fixing problems that should not have arisen or should have been fixed before the equipment was delivered to Equistar, resulting in $286,998 in damages to Equistar;

- Indeck is liable for breach of contract for providing Equistar with inefficient transportation services, because Indeck delayed releasing customs paperwork for the boiler shipment across the Canadian border, which delayed shipment and added a month to Equistar's railcar rental charges, resulting in $44,000 in damages to Equistar; and

- Indeck is liable for Equistar's reasonable attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code.

Based on the record evidence, the total damage award in favor of Equistar is **$644,859**. Equistar must submit a proposed final judgment, consistent with the court's findings and conclusions, no later than **April 1, 2021.** It may submit its attorneys' fee application in accordance with Rule 54 of the Federal Rules of Civil Procedure.

The detailed findings of fact and conclusions of law are set out below.

2

## I.      Introduction and Background

### A.      The Issues

Equistar owns and operates facilities used in producing chemicals, plastics, and other products.  Indeck manufactures and sells industrial steam boilers.  In 2015, Equistar and Indeck entered into a contract for Indeck to provide two steam boilers, related equipment, and services to Equistar's plant in Tuscola, Illinois.  Indeck supplied the two steam boilers and the related equipment to Equistar and supplied service technicians who oversaw the installation and start-up. Indeck estimated that its service technician would get the boilers fully operating with 36 days of work after delivery.  Instead, it took two technicians who worked on the boilers for a total of 186 nonconsecutive days.  The causes and costs of that extended worktime are one basis of this lawsuit.

In September 2019, Equistar sued Indeck for breach of contract, breach of warranty, and professional negligence.[2]  Equistar seeks reimbursement of $795,298 that it paid as a result of alleged defects in the boiler design or manufacture and inefficiencies in Indeck's installation and start-up services.  This represents out-of-pocket invoiced amounts that Equistar paid, not lost profits or other consequential damages.

In February and March 2021, the court held a six-day bench trial by Zoom.  The parties presented and cross-examined witnesses, submitted many exhibits, and presented arguments on the following issues:

- whether Indeck materially breached its contractual warranties by providing Equistar with defective materials;

- whether Indeck materially breached the parties' Master Contract by providing inefficient services to Equistar and charging for excessive rework and for unreasonable railcar rental fees; and

---

[2]  In its original answer, Indeck asserted a counterclaim for a declaratory judgment.  (Docket Entry No. 4 at ¶¶ 49–52).  Indeck agreed to dismiss that counterclaim at the parties' initial conference.  (Docket Entry Nos. 15, 16).

- whether Indeck was professionally negligent in its design and manufacture of the boilers.

Both sides were thorough and professional in their presentations. Without that, this case would have been more difficult and complex. The court appreciates the work of counsel for both sides.

## B.    The Witnesses and Evidence

Equistar presented the following witnesses:

- Michael Holt, an Equistar engineer;
- Maureen Radi, an Equistar engineer;
- Greg Wassilkowsky, Indeck's director of engineering;
- Perry Danniger Smith, project manager for Equistar's boiler project; and
- Richard A. Gehse, a licensed professional engineer designated as an expert witness.

Indeck presented the following witnesses:

- David Pruyn, Indeck's instrumentation and controls manager;
- Bob Swanton, an Indeck service technician;
- Ray Henry, a licensed professional engineer designated as an expert witness; and
- Marsha Forsythe, Indeck's president and chief executive officer.

Equistar submitted 37 exhibits, (Docket Entry No. 35), and Indeck submitted 119 exhibits, (Docket Entry No. 36). Those exhibits include documents relating to: Equistar's Tuscola plant; the parties' agreements and communications; the parties' records and invoices; and the boiler schematics, testing, operation, and repairs.

## C.    The Master Contract

The parties' disputes arise from Articles 2(a), 8(b), 13(a)(iii)(A), (B), 13(a)(v), 13(w)(i), 16, and 24 of the Master Contract.

Article 2(a) reads:

2. Acceptance & Scope of Supply.

   a. Contract Documents. This Contract is expressly limited to the terms and conditions stated herein. This Contract shall consist of the Contract Documents issued under

and incorporating the terms and conditions of this Contract.  This Contract and each [purchase order] issued by [Equistar] pursuant to the terms and conditions set forth in this Contract, constitutes the complete agreement of the Parties with regard to this transaction, and shall constitute a merger of all prior proposals, negotiations and representations and may not be altered, amended or modified except in writing and signed on behalf of both Parties.  No purchase orders, confirming orders, or other documentation, written or oral, by either Party modifies, alters or changes the express written terms of this Contract.  Any [purchase order] issued pursuant to this Contract, shall not amend or modify this Contract in any respect, except to describe the Scope of Supply to be purchased and the scheduled dates for the Scope of Supply to be supplied or delivered.  Additional or conflicting contractual terms or conditions that are not encompassed in this Contract may be added only through a written amendment to this Contract and not through a [purchase order], and any conflicting contractual terms and conditions contained in any [purchase order], shall be null and void and of no force and effect.

(Equistar Exh. 7).  Indeck asserts that the Master Contract was amended by the terms of a purchase order sent after the parties signed the Master Contract.  Equistar asserts that the purchase order did not modify the Master Contract.  As set out more fully below, the court finds and concludes that the purchase order did not modify or amend the Master Contract.

Article 8(b) reads:

8. Terms of Payment.

    b. Disputed Invoices.  In the event [Equistar] disputes any invoice amount, [Equistar] may either (i) withhold the disputed amount, or (ii) without waiver of any of its rights, including the right to seek reimbursement, pay the disputed amount and later seek reimbursement.  In the event of a dispute, the Parties will promptly attempt to resolve the dispute and, upon resolution, [Equistar] will pay the portion of the disputed amount that the Parties have mutually agreed is due and owing, if any, to [Indeck].  During the pendency of any dispute, [Indeck] shall perform its Scope of Supply and other obligations under this Contract.

(Equistar Exh. 7).  This Article allows Equistar to pay invoices that it disputes and then seek reimbursement.  Indeck asserts that Equistar did not promptly provide documents in support of its warranty claims to attempt to resolve the dispute.  (Docket Entry No. 44 at 28–32).  At trial, the parties disputed whether Article 8(b)'s statement that "the Parties will promptly attempt to resolve dispute" is a condition precedent to Equistar's recovery that Equistar breached.  As set out below,

Equistar timely provided information to Indeck, did not breach a duty to attempt resolution, and is

not precluded from recovery on this basis.

Article 13 sets out Indeck's warranties.

13.  Warranty.

a. Warranty.

i.  Prior to acceptance of the Materials or Services by [Equistar] at time of delivery, [Indeck] shall, at no charge to [Equistar], correct any discrepancies, omissions, and/or errors in the Materials or Services.

ii.  [Indeck] warrants that the Materials which [Indeck], or its Subcontractors of any tier, supply will be new and of good and merchantable quality conforming to the specifications stated in this Contract and free from defect in material and workmanship during the Materials Warranty Period.  [Equistar] will be entitled to inspect or reinspect all Materials before, upon or within a reasonable time, after delivery.  No substitution of any Materials will be made without [Equistar's] written approval.

iii.  A – Materials Warranty At Start-Up:  Should a defect in the Materials be found at Start-up (with "Start-up" defined as the first fire or flue gas in the Materials) while [Indeck's] Service Technician is on site, [Indeck] will pay for the removal of the old part, installation of the new or repaired part, labor associated with such removal and installation, and freight costs . . .

B – During the Material's Warranty Period and at Start-up (as defined in 13-a-iii-A above) if [Equistar] does not use [Indeck's] Service Technician, [Indeck] shall, if mutually agreed to by [Equistar] and [Indeck], repay [Equistar] the full price paid for the defective Materials (or part thereof), or at [Indeck's] sole option, shall promptly repair or replace, at its sole cost and expense . . . any defective Materials which [Equistar] has identified and has notified [Indeck] within fifteen (15) days of discovery of such defective Materials, for up to the earlier of (i) twenty-four (24) months following delivery of [Indeck's] manufactured equipment only or offer to ship if shipment is delayed by no fault of [Indeck], or (ii) eighteen (18) months after Start-up of [Indeck's] manufactured equipment (the "Materials Warranty Period"). . . .

v.  [Indeck's] warranties shall also apply to the Materials and Services performed by its Subcontractors.  [Indeck] shall procure from all Subcontractors similar warranties with respect to Materials procured from or Services performed by such Subcontractors which shall be warranted and limited to the extent as provided by such Subcontractors; provided however, that such Subcontractor warranties shall extend for a minimum of twelve (12) months from Start-up and

> not to exceed 18 months from delivery or offer to ship if shipment is delayed by no fault of [Indeck], and further provided that Subcontractors warranties shall not relieve [Indeck] from its other warranties hereunder. . . . If [Indeck] fails to so repair or replace defective or nonconforming parts, [Indeck's] liability will not exceed [Equistar's] reasonable costs of repair or replacement.  [Indeck's] sole responsibility, and [Equistar's] exclusive remedy hereunder, will be limited to such repair, replacement, or repayment of the purchase price of the parts as above provided.

(Equistar Exh. 7).

Equistar asserts that Indeck breached Article 13(a)(i) and (ii), because Indeck supplied materials that were not of good quality or that did not conform to Equistar's specifications, and because Indeck failed to correct those deficiencies before delivering the materials.  Equistar asserts that Indeck breached Article 13(a)(iii)(A), (B), and (a)(v), because design and manufacturing defects were discovered at start-up, while an Indeck service technician was on site, and during the relevant warranty periods, and Indeck did not pay the resulting costs.  Indeck asserts that some of the defects were not found within the warranty periods and that Equistar did not provide timely notice under Article 13(a)(iii)(B).

As set out more fully below, the court finds and concludes that Indeck breached its warranties as to the forced-draft fan shaft, the fuel-gas skid, and the water bridles, because the defects were discovered at start-up, while Maurice Mockler was on site, and Indeck did not pay the resulting costs.  The court finds and concludes that Indeck breached its warranties as to the excessive-vibration issue, but that Equistar did not provide timely notice as required by Article 13(a)(iii)(B).

Article 13(w)(i) states that "[Indeck] and its Subcontractors agree to . . . provide Materials and Services in a good, efficient and safe manner."  (Equistar Exh. 7).  Equistar alleges that Indeck materially breached that provision by providing inefficient services.  Indeck argues that its services were not inefficient.  As set out below, Indeck's service technicians did provide inefficient

7

services.  The work of finding and addressing defects exceeded reasonable expectations and limits.

And much of the work had to be reinspected and redone, for reliability and safety.

Indeck also provided inefficient transportation services because it delayed the boilers'

shipment.  The court finds and concludes that Indeck breached Article 13(w)(i) by providing

inefficient services.

Article 16 provides:

[Indeck] shall be an independent contractor with respect to the performance of any Scope
of Supply, and neither [Indeck], nor any of [Indeck's] Subcontractors, shall be deemed for
any purpose to be the employee, agent, servant, or representative of [Equistar] in the
performance of any Scope of Supply hereunder.  [Equistar] shall have no direction or
control of [Indeck] or its employees, agents and Subcontractors, except in the results to be
obtained.  The Scope of Supply contemplated herein shall meet [Equistar's] approval and
be subject to [Equistar's] right of inspection herein provided for [Equistar] to secure the
satisfactory completion hereof.  The actual performance and supervision of any Scope of
Supply shall be by [Indeck], but [Equistar], or its representative, shall have unlimited
access to the Scope of Supply to determine whether the Scope of Supply is being performed
by [Indeck] in accordance with all the provisions of this Contract.

(Equistar Exh. 7).  Indeck asserts that Equistar materially breached Article 16 by exerting such

control over Indeck's subcontractors that they became Equistar's subcontractors, and that the

breach precludes Equistar from recovering damages.  Equistar denies that it breached Article 16.

As set out below, Equistar did not breach Article 16 on this basis.

Article 24 provides:

24.  Notice. Except as otherwise provided herein, any and all notices, consents, or other
communications between the Parties, in order to be effective, shall be in writing and shall
be sent via personal delivery, e-mail, fax, or by Federal Express or similar overnight
service, by first class certified mail, return receipt requested, to the [parties'] addresses . . .

(Equistar Exh. 7).  Equistar argues that Article 24's written-notice requirement does not apply to

the excessive-vibration defects, because, when the defects were discovered, Indeck's service

technician was on site and aware of the defects.  Equistar has not identified any provision that

"otherwise provide[s]" that written notice is not required in that situation.  Indeed, after arguing

8

that Article 13(a)(iii)(A) or (B) applies to the excessive-vibration defects, Equistar argues that Article 13(a)(iii)(B) does not apply and that the Master Contract is silent on the notice issue.  With no other applicable provision, Equistar asks the court to conclude that Equistar's notice obligation is governed by Texas law, which requires "reasonable" notice.

No provision "otherwise provide[s]" that written notice is not needed for material defects discovered after start-up while Indeck's service technicians were on site and aware of the defects. Because the parties did not anticipate having Indeck's service technician on site working on the boilers for long, the warranties in Article 13(a)(iii) are split between defects found at start-up with Indeck's technicians, which do not require written notice, and other material defects, which require written notice.  Article 13(a)(iii)(A) "otherwise provide[s]" that written notice is not required for material defects found at start-up if Indeck's service technician is overseeing the start-up. (Equistar Exh. 7).  As set out more fully below, the court finds and concludes that:  the excessive-vibration defects were not found at start-up; the defects were governed by Article 13(a)(iii)(B); and Equistar did not provide timely written notice of the excessive-vibration issue within the relevant warranty periods, making Indeck not liable for breach of warranty as to those defects.

A more detailed explanation follows.

## II.    Findings of Fact and Conclusions of Law[3]

### A.    Findings of Fact

#### 1.    Background

Since the 1950s, Equistar's Tuscola, Illinois, plant has manufactured synthetic ethanol and related byproducts for use in various products, including pharmaceuticals and makeup.  Steam boilers power the manufacturing and operations in the 900-acre plant.  In the latter half of the

---

[3]  Any findings of fact that are also, or only, conclusions of law are so deemed.  Any conclusions of law that are also, or only, findings of fact are so deemed.

twentieth century, Equistar converted the plant's steam boilers from coal-powered to coal-and-natural-gas powered.  In 2014, changes in Environmental Protection Agency regulations and rising costs led Equistar to replace those with boilers fully powered by natural gas.  Equistar solicited bids for the new boilers and selected Indeck as the winning bidder.

In December 2015, Equistar and Indeck signed the Master Contract and a purchase order. (Equistar Exhs. 7, 8).  Indeck agreed to provide two steam boilers and related components, including instrumentation and controls, and to provide installation and start-up services at the Tuscola plant. (Docket Entry No. 30 at 4–5).  Indeck, in turn, made agreements with various subcontractors for the design, manufacture, assembly, and shipment of different components of the boilers.

Indeck offered to ship the main boiler components, which it manufactured, on April 30, 2016.  Indeck shipped the boilers from Canada by railcar.  The boilers were delayed in crossing the Canadian border because Indeck withheld customs paperwork as part of its ongoing negotiations with Equistar.

The boilers arrived at the Tuscola plant on June 27, 2016.  Equistar promptly began commissioning the boilers, assembling and adjusting the components to make the boilers functional.  That work continued as Equistar received more components from Indeck.  Equistar received two forced-draft fans[4] in September 2016, two water bridles[5] in January 2017, and two fuel-gas skids[6] in February 2017.  Indeck's subcontractors manufactured those components to Indeck's specifications.

---

[4]  A forced-draft fan forces oxygen into the boiler to maintain combustion.
[5]  A water bridle measures the level of water and steam inside the boiler.
[6]  A fuel-gas skid is a self-contained device comprising pipes and valves that control the flow of natural gas into the boiler.

In February 2017, Equistar sent Maureen Radi, a chemical engineer, and Holly Tutich, an electrical engineer, to oversee a factory-acceptance test[7] for Indeck's programmable-logic computers, which act as the "brains" controlling the boilers.  Indeck's instrumentation and controls manager, David Pruyn, also attended the test.  Over several days, Equistar's engineers and Indeck's technicians tested the equipment to see if the computer responded correctly in different simulated situations.  Maureen Radi credibly testified that the test revealed that numerous changes had to be made for the boilers to operate safely.  (Equistar Exh. 9).  Because the Equistar team found the results of the first test unacceptable, they asked Indeck to do a second factory-acceptance test.

The second factory-acceptance test occurred in March 2017.  Equistar's engineers again identified various defects to be fixed.  (Equistar Exh. 10).  Equistar received the programmable-logic computers and human-machine interfaces from Indeck shortly after this test.  Because Indeck did not allow Equistar to see the programming, Equistar could not verify whether the changes that it asked Indeck to make had been made.

In March 2017, Equistar also sent Indeck a purchase order to have an Indeck service technician work on the boilers at the Tuscola plant.  (Equistar Exh. 33).  The parties planned on the technician working for 36 days.

In May 2017, Maurice Mockler, the assigned Indeck service technician, began working on the boilers at the plant.  Throughout May and June, Mockler helped install and test the various components.  On July 19, 2017, Mockler conducted the "first firing" of the boilers.  That quickly revealed several problems.  In one boiler, the forced-draft fan vibrated and failed to operate correctly.  The water bridles, which were supposed to measure the level of water and steam inside

---

[7]  A factory-acceptance test examines the inputs and outputs of sensors and field instruments to ensure that the boiler's internal logic acts correctly in varying circumstances.  That is, when X happens, the sensors acknowledge that X happened and transmit that information to the computer, which tells various instruments to make Y happen in response.

each boiler's main drum, failed to operate correctly.  And the emergency valves on the fuel-gas skid, which were supposed to swiftly cut the flow of natural gas into each boiler in emergency situations, failed to close quickly enough, raising significant safety concerns.  Mockler worked on each issue with several subcontractors and invoiced Equistar for the costs involved.  Equistar paid, subject to the contractual right to seek reimbursement.

On the forced-draft fan, it was determined that the fan shaft, which connects the internal fan to the motor, was defectively manufactured.  Excess space between the shaft and one of its bearings resulted in vibration.  An Indeck subcontractor had manufactured that fan.  After discovering the issue and removing the shaft from the fan, Equistar sent the fan to the subcontractor, which did the repairs.  The repaired shaft was reinstalled in the fan, and it worked properly.

On the water bridles, it was determined that the internal guided-wave radars were defectively manufactured by an Indeck subcontractor, VEGA.  Equistar worked with VEGA to correct the issue.  This required new radars, adjustments to the components housing the radars, and attaching the new radars to the boilers.  After those modifications, the radars worked properly. Indeck alleges that when Equistar was investigating the water-bridle defects, VEGA ceased being Indeck's subcontractor because VEGA began working directly with Equistar, rather than through Indeck and at Indeck's sole direction.  But Indeck concedes that when the water bridles were designed, manufactured, delivered, and installed, VEGA was Indeck's subcontractor.

On the fuel-gas skid, it was determined that the emergency shutoff valves were internally corroded due to water contamination.  The source of the water contamination is disputed.  Equistar asserts that the water contamination was present when the skid was delivered, fully wrapped. Indeck speculates, but offers no evidence, that the contamination occurred after delivery.  Equistar

sent the valves to a third party, which examined, disassembled, repaired, reassembled, and tested the valves. (Indeck Exhs. 60–64). The repaired valves worked properly when reinstalled.

While these repairs and replacements were ongoing, Perry Danniger Smith, Equistar's project manager for the boiler-replacement project, made a spreadsheet of the costs Equistar incurred to investigate and correct each issue. (Equistar Exh. 31). Smith credibly testified that he determined those costs based on purchase orders, invoices, timesheets, and meeting notes. He credibly testified that the hours and rates the subcontractors charged to resolve each issue were reasonable and within customary ranges. Richard Gehse, Equistar's engineering expert, credibly testified that the rates were reasonable and customary and was for work that had to be done to operate the boilers safely.

At the end of July 2017, Maurice Mockler stopped working on the boilers. He had worked for 81 nonconsecutive days. In August 2017, Bob Swanton, another Indeck service technician, arrived at the Tuscola plant and continued the work.

In September 2017, Aaron McKee, site manager at the Tuscola plant, emailed Greg Wassilkowsky, Indeck's director of engineering, and others. McKee's email listed several problems that made the boilers fail to operate properly or safely. Some had required costly repairs, and some remained problems. That list included: (a) Maurice Mockler's initial rework of Indeck-supplied controls; (b) the fuel-gas skid contamination; (c) the forced-draft fan shaft defect; (d) Bob Swanton's rework of what Maurice Mockler had done either incorrectly or unreliably; and (e) the ongoing water-bridle problems. (Equistar Exh. 13). In response, Greg Wassilkowsky asked for documents and more detail. (Indeck Exh. 75). Wassilkowsky also stated that Indeck would not pay for a service technician to continue working at the Tuscola plant unless Equistar paid all the

amounts Indeck had invoiced Equistar, including amounts that Equistar disputed.  (*Id.*).  Equistar continued to pay Indeck's invoices, and Bob Swanton continued working.

In November 2017, Swanton stopped working on the boilers.  By that point, he had worked for 105 nonconsecutive days, in addition to the 81 days Mockler had worked.  When Swanton stopped working, the boilers were operational, but not at maximum capacity.  The primary problem: the boilers vibrated excessively, to the point that they shut themselves off.  Michael Holt and Perry Danniger Smith of Equistar credibly testified that they orally discussed the excessive-vibration issue with Mockler and Swanton from July to November 2017.

Swanton returned to the Tuscola plant in January and February 2018 to do more work on the boilers.  In March 2018, Equistar turned off their old boilers and began relying on the new, Indeck-provided boilers, within days of a deadline imposed by the Environmental Protection Agency.  The excessive-vibration problem continued.

In October 2018, Equistar hired XRG Technologies to analyze the excessive-vibration issue.  Before XRG issued its first report, Aaron McKee at Equistar sent Greg Wassilkowsky at Indeck a letter stating that the boilers were vibrating excessively, damaging both the boilers and other property.  (Equistar Exh. 16).  McKee wrote Indeck that the vibration problem had existed throughout 2017 and became worse over time, resulting in several equipment failures.  McKee asked Indeck to provide the support needed to resolve the problem.  (*Id.*).  Indeck responded that the warranty had expired and refused.  (Indeck Exh. 78)

XRG's first report, issued in October 2018, stated that the vibration ranged from "slightly rough" to "very rough" and recommended several modifications to the boilers.  (Equistar Exh. 17).  XRG recommended, among other things, that, for each boiler, the inlet boxes for the forced-draft

fans should be braced, the burners should be tuned, and the baffle[8] should be installed in the outlet ducting.  XRG's second report, issued in March 2019, stated that, after Equistar modified the forced-draft fan by installing a baffle and reinforcing the ductwork, peak vibration was reduced by 25 to 55 percent, but vibration remained "rough."  (Equistar Exh. 18 at 9).

In May 2019, Aaron McKee emailed Greg Wassilkowsky, demanding reimbursement for costs related to seven items:  (1) the excessive amount of work to detect and address defects in Indeck-supplied equipment that Maurice Mockler did; (2) investigating and repairing the defective forced-draft fan shaft; (3) investigating and repairing the defective fuel-gas skid; (4) the excessive amount of rework that Bob Swanton had to do, both because problems persisted and Mockler's work was unreliable and inefficient; (5) investigating and repairing the defective water bridles; (6) charges for one month of railcar rental; and (7) investigating and repairing the boilers' excessive vibration.  (Equistar Exh. 19).  Indeck refused to pay any of the amounts.  This lawsuit followed.

### 2.    Claim-Specific Findings of Fact

Many of the facts that Equistar alleges in support of its claims are undisputed.  The court focuses on the factual disputes for each of the seven issues.

### a.    The Forced-Draft Fan Shaft Defect

Indeck does not dispute the following facts:  Indeck, or its subcontractor, supplied the forced-draft fan to Equistar; the fan's shaft was improperly manufactured; the problem was discovered while Maurice Mockler was on site at the Tuscola plant; the shaft had to be fixed; the forced-draft fan was covered by Indeck's Master Contract warranties; Equistar paid the costs of

---

[8]  A baffle is a metal plate with holes that distributes airflow evenly.

investigating and fixing the shaft; and Indeck did not reimburse Equistar for those costs. Indeck disputes the amount of costs it owes.

Perry Danniger Smith's spreadsheet shows that Equistar paid $179,795 to investigate and repair the fan shaft. (Equistar Exh. 31). He credibly testified that the amount was accurate, based on purchase orders, invoices, timesheets, and meeting notes. He also testified that the rates the subcontractors charged were reasonable and customary. Richard Gehse, Equistar's engineering expert, agreed.

Indeck disputes the amount of Equistar's damages, but it admits that Equistar incurred the costs and does not credibly explain why the amounts are excessive or what the proper amount should be. The court finds and concludes that Indeck breached its warranties as to the forced-draft fan and that Equistar incurred $179,795 in damages due to the defective forced-draft fan shaft. As set out in more detail below, Indeck is liable to Equistar for this amount.

### b.     The Fuel-Gas Skid Defect

Indeck does not dispute the following facts: an Indeck subcontractor manufactured the fuel-gas skid; when Equistar tested it, the skid's emergency shutoff valves did not close fast enough; the problem needed to be fixed; Indeck was aware of the issue at start-up; Indeck's Master Contract warranties covered the fuel-gas skid; Equistar paid the costs to investigate and fix the valves; and Indeck did not reimburse Equistar for those costs. Indeck disputes whether the cause of the valve defect—water contamination—happened before or after the skid was delivered to Equistar. The record evidence clearly shows that it happened before, on Indeck's watch.

The skid was delivered, wrapped in plastic, to Equistar's Tuscola plant in February 2017. Equistar stored the skid with the wrapping intact in a warehouse for several weeks. Perry Danniger Smith credibly testified that, when Equistar employees first removed the wrapping, water and

sludge leaked from the skid.  Richard Gehse, Equistar's engineering expert, testified that the sludge indicated that water had been in the skid for an extended period.  He testified that the degree of corrosion found in the valves when they were later inspected confirmed prolonged water contamination.  Greg Wassilkowsky testified that Indeck had no knowledge about what caused that contamination.  Indeck's engineering expert, Ray Henry, speculated that Equistar could have caused the contamination through mishandling, but acknowledged that there was no evidence to support this.

The record evidence does show a likely explanation for the water contamination and corrosion.  In January 2017, before the skid was delivered to Equistar, Indeck's subcontractor, Zeyon, hydrotested parts of the skid.  (Indeck Exh. 119).  Richard Gehse testified that, after hydrotesting, the hydrotested components would need to be blown-dry and water-absorbing desiccant would need to be applied.  Zeyon's hydrotesting certificate does not indicate that either was done after hydrotesting.  Conversely, the record evidence shows that an Equistar subcontractor, Bluewater, cleaned and dried Equistar's gas lines in April 2017, before the fuel-gas skid was installed.  Based on the record evidence and testimony, the court finds that the fuel-gas skid had water contamination and corrosion when Indeck delivered it to Equistar.

Perry Danniger Smith's spreadsheet shows that Equistar paid $40,101 to investigate and repair the fuel-gas skid valves.  (Equistar Exh. 31).  He credibly testified that the amount was accurate, based on purchase orders, invoices, timesheets, and meeting notes.  He also credibly testified that the rates the subcontractors charged were reasonable and customary.  Richard Gehse, Equistar's engineering expert, agreed.  Indeck concedes that Equistar incurred the costs and does not argue that the $40,101 Equistar paid is unreasonable or incorrect.  The court finds and concludes that Equistar incurred $40,101 in damages due to the defective fuel-gas skid valves; as

set out in more detail below, Indeck breached its warranties as to the valves; and Indeck is liable to Equistar for $40,101 in damages for the breach.

### c.      The Water-Bridle Defects

Indeck does not dispute the facts underlying Equistar's breach-of-warranty claim based on the defective water bridles.   Indeck does not dispute that its subcontractors designed and manufactured the water bridles; the bridles were defective; the defects were serious and had to be fixed; Indeck was aware of the issue at start-up; Indeck's warranties apply to the bridles; and Equistar incurred damages addressing the bridle defects.

Perry Danniger Smith's spreadsheet shows that Equistar paid $93,965 to investigate and repair the water bridles.  (Equistar Exh. 31).  He credibly testified that the amount was accurate, based on purchase orders, invoices, timesheets, and meeting notes.  He also credibly testified that the rates the subcontractors charged were reasonable and customary.  Richard Gehse, Equistar's engineering expert, agreed.  Indeck concedes that Equistar incurred these amounts and does not argue that the $93,965 Equistar paid is unreasonable or incorrect.  The court finds and concludes that Equistar incurred $93,965 in damages due to the defective water bridles, that Indeck breached its warranties as to the bridles, and that Indeck is liable to Equistar for $93,965.

### d.      Excessive Vibration

Equistar alleges that, due to defective design and manufacturing, the boilers vibrated excessively, causing the boilers to turn off and damaging other Equistar property.  To fix the problem, Equistar alleges that it had to install a baffle in one forced-draft fan outlet duct, adjust the probes inside the burners, and stiffen the ductwork with steel-rod bracing.  Equistar paid $150,409 to investigate and repair the vibration problem.

18

Indeck does not dispute that it or its subcontractors supplied the boilers, the forced-draft fan, burner, and the ductwork.  Marsha Forsythe, Indeck's president and chief executive officer, and Greg Wassilkowsky both testified to those facts.  Indeck disputes that the boilers vibrated excessively.

Perry Danniger Smith and Michael Holt credibly testified that, between July and November 2017, they discussed the vibration issue with Maurice Mockler and Bob Swanton multiple times. In October 2018, Equistar hired XRG Technologies to investigate the vibration issue.  XRG issued two reports.  The first report, issued at the end of October 2018, shows that, despite previous remediation steps, the vibration ranged from "slightly rough" to "very rough" in different parts of the boilers.  (Equistar Exh. 17 at 8).  XRG's second report, issued in March 2019, shows that, after Equistar modified a forced-draft fan by installing a baffle and reinforcing the ductwork, peak vibration was reduced by 25 to 55 percent.  Although vibration remained "rough" in some parts of the boilers, no area showed "very rough" vibration.  (Equistar Exh. 18 at 9).  Indeck's engineering expert, Ray Henry, testified that the modifications Equistar made are consistent with treating excessive vibration.  The court finds and concludes that, contrary to Indeck's position, the credible evidence showed that the boilers vibrated excessively, making them unsafe and not properly functional.

Perry Danniger Smith's spreadsheet shows that Equistar paid $150,409 investigating and addressing the excessive-vibration issue.  (Equistar Exh. 30).  The spreadsheet identifies those costs as including:  $75,500.01 for XRG's examination of the boilers; $41,788.87 for six repairs made on one boiler from December 2018 to January 2019; and $33,120.06 for eight repairs made on the other boiler from September 2018 to February 2019.  Perry Danniger Smith credibly testified that those costs resulted from the three main repairs made to each boiler—installing the

baffle, adjusting the burner probes, and reinforcing the ductwork.  He also credibly testified that the rates the contractors charged for the repairs were reasonable and customary, and that the repairs were necessary to diagnose and repair the excessive vibration.  Indeck does not dispute the amounts paid.  The court finds that Equistar incurred $150,409 in damages due to the excessive vibration, and that the excessive vibration resulted from Indeck's breach of warranty.  The issue, addressed below, is whether Equistar provided timely notice.

e. **Excessive Work by Maurice Mockler and Rework by Bob Swanton**

When Maurice Mockler arrived at the Tuscola plant in May 2017, Equistar and Indeck planned for him to work for 36 days.  Instead, he worked for 81 nonconsecutive days.  Equistar alleges that much of Mockler's time was spent addressing issues that should not have arisen or that should have been resolved before Equistar received the boilers, or on redoing work that he previously did incorrectly.  Equistar incurred $197,730 in added costs as a result of Mockler's excessive work.  Equistar similarly alleges that Bob Swanton, who worked on the boilers for 105 nonconsecutive days after Mockler left, spent excessive time doing work that should not have been needed or that should have been done before Equistar received the boilers, or on redoing or fixing work that Maurice Mockler had done, resulting in $89,268 in Swanton's excessive work.  Indeck disputes that this work was excessive and that it breached its duty to provide efficient services.

Maureen Radi of Equistar credibly testified that when Equistar received the programmable-logic computers, they were not fully operational.  Radi found multiple errors when she tested the computers with Mockler.  To address those errors, Maurice Mockler repeatedly contacted David Pruyn, Indeck's director of instrumentation and controls.  In May 2017, David Pruyn visited the Tuscola plant to install different software on the computers.  Radi testified that, in addition to this work, Mockler had to spend significant time recalibrating the ranges on various transmitters, work

that should have been completed before Equistar ever received the transmitters.  Radi similarly testified that Bob Swanton had to do work to address problems that should have been fixed before delivery or work that Mockler had done, such as recalibrating transmitters, that was unreliable.

Bob Swanton testified that, when he arrived at the Tuscola plant in August 2017, the work was described as nearly complete.  He credibly testified that it was not.  Although the boilers had been started up, they were not operational.  Bob Swanton credibly testified that he found "most of what had been done with the combustion control system . . . to be of questionable value."  He had to redo work Maurice Mockler had done.  The rework required a few hours for some issues, but several days for other issues.  Swanton credibly testified that he had to spend additional time on work that should have been done before he arrived.  For several issues, such as the burner-management control system, Swanton testified that there was an uncharacteristically large amount of rework that had to be done because Indeck failed to do the work before delivery, or that work was defective, and because of inefficient and unreliable work by Mockler after delivery.

Perry Danniger Smith credibly testified that he approved Mockler's and Swanton's timesheets and that the invoices Indeck submitted reflected the time they spent on the work they performed.  Danniger Smith credibly testified that his signature acknowledged their work, but it did not mean that he or Equistar agreed that Equistar would pay for the work.  Danniger Smith testified that he chose the contract option of paying and later seeking reimbursement because Indeck would stop the work on the boilers if Equistar did not pay.  The Environmental Protection Agency imposed a firm deadline to finish the boiler replacement project, and Equistar had to pay Indeck under protest to meet the deadline.  Article 8(b) of the Master Contract states that, if Equistar "disputes any invoice amount," it can, "without waiver of any of its rights, including the

right to seek reimbursement, pay the disputed amount and later seek reimbursement." (Equistar Exh. 7). Equistar followed the Master Contract.

Danniger Smith's spreadsheet shows that Equistar paid $197,730 for the excessive work Maurice Mockler did and $89,268 for the excessive work and rework Bob Swanton had to do. (Equistar Exh. 31). Danniger Smith credibly testified that those amounts, while uncharacteristically high because of the need to repair the defects and to redo some of the repair work, were accurate, based on invoices, timesheets, and meeting notes. The spreadsheet shows that much of the cost was for the subcontractors working with Mockler and Swanton as they worked on the boilers. Danniger Smith credibly testified that many changes Maurice Mockler and Bob Swanton made required assistance from other subcontractors that Equistar had to pay. Bob Swanton testified that other subcontractors had to assist with adjusting and testing the boilers and their components. Danniger Smith credibly testified that these subcontractors charged reasonable and customary rates. Richard Gehse, Equistar's engineering expert, agreed.

Based on the record evidence and testimony, the court finds that Maurice Mockler and Bob Swanton performed an excessive amount of work and rework, resulting in an additional cost of $286,998 to Equistar. The work was required to fix the defects or to fix unreliable or unsuccessful efforts by Indeck service technicians to fix the defects that had to be redone. The court finds and concludes that Indeck breached Article 13(w)(i) of the Master Contract by causing the excessive work and is liable to Equistar in the amount of $286,998.

### f.    The Railcar Rental Charge

The boilers were shipped by railcar to Equistar's Tuscola plant from an Indeck affiliate in Canada. Indeck offered to ship the boilers in April 2016, and it did so in June 2016. The railcars with the boilers arrived at the Tuscola plant on June 27, 2016. (Indeck Exhs. 101, 102). The

railcars remained at the Tuscola plant until July 11, 2017.  (Indeck Exh. 102).  Indeck charged

Equistar $44,000 per month for the railcar rental, and $21,500 for the time Equistar had the railcars

after the boilers were delivered.  Equistar paid Indeck $109,500 for transportation costs in

September 2016.  (Indeck Exh. 99).

Equistar alleges that Indeck intentionally delayed releasing customs forms and freight-

invoice processing for the boiler shipment, resulting in two month's additional railcar rental fees.

Aaron McKee's May 2019 letter to Greg Wassilkowsky, Indeck's director of engineering,

summarized Equistar's position:

> After purchase and shipment of the package boilers, Equistar suffered two months of delay
> because of issues getting the packages across the Canadian border and to the site.  While
> some of the delay was caused by the Parties' negotiations, Equistar incurred significant
> delays because Indeck withheld customs forms and delayed processing of freight invoicing
> for all equipment (split between boilers, steel, auxiliary equipment assemblies, etc.).  The
> direct cost impact is additional freight rental incurred by Equistar.  Equistar is willing to
> share the cost of the additional freight rental, wherein each Party is accountable for one
> month's rent.

(Equistar Exh. 19).

Perry Danniger Smith credibly testified that Indeck's delay in providing necessary customs

paperwork caused a five- or six-week delay in the boiler delivery.  While Danniger Smith testified

that he did not know what specific documents Indeck withheld, Michael Holt also credibly testified

that one cause of the delay was Indeck withholding necessary customs paperwork.  Marsha

Forsythe of Indeck testified that both boilers were loaded on railcars, ready to ship, in March 2016,

but they could not be shipped because Equistar did not have the permits needed to receive and

unload the boilers.  Equistar and Indeck had agreed that Indeck would not charge Equistar railcar

rental charges through April 30, 2016.  Aaron McKee's letter acknowledges that the negotiations

between Equistar and Indeck played a role in the delay.

The testimony shows that both Indeck and Equistar contributed to the delay in shipping the boilers across the Canadian border, not just Equistar, as Indeck argues.   Marsha Forsythe speculated on why Equistar failed to get the permits she alleges, but it is speculation and her testimony was not credible.   Indeck breached Article 13(w)(i) by failing to perform shipping-related services in an efficient manner.   Indeck must pay for one month of the railcar charges, in the amount of $44,000.

### B.   Conclusions of Law

Texas law governs this dispute.   (Equistar Exh. 7).   Equistar asserts three categories of claims against Indeck:   (1) breach of warranty; (2) breach of contract; and (3) professional negligence.   The court address each category in turn.

### 1.   Breach of Warranty

Indeck is liable for breach of express warranty if:  (1) it sold goods or services to Equistar; (2) it made representations to Equistar about the quality and characteristics of the goods or services; (3) those representations formed part of the basis of the parties' bargain; (4) the goods or services did not comply with the representations; (5) Equistar notified Indeck of the failure; and (6) Equistar suffered damages due to the failure.   TEX. BUS. & COM. CODE §§ 2.313, 2.607(c)(1), 2.714, 2.715; *Minsa Corp. v. SFTC, LLC*, 540 S.W.3d 155, 161 (Tex. App.—Amarillo 2017, pet. denied); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied).

### a.   The Forced-Draft Fan, Fuel-Gas Skid, and Water Bridles

The facts establish that Indeck breached its warranties to Equistar as to the forced-draft fan, the fuel-gas skid, and the water bridles.   Indeck does not dispute that it sold those materials to Equistar, it made warranties about those goods, those warranties formed part of the Master

Contract, Indeck was aware of their defects, and Equistar incurred damages addressing their defects.  Indeck does not dispute that the forced-draft fan and the water bridles were defective when delivered.  The court has found that the fuel-gas skid was defective when delivered.  The court's findings of fact establish that Indeck breached its warranties as to these three pieces of equipment.

Indeck asserts that Equistar should not recover its damages on these three claims because: (1) Equistar failed to provide sufficient timely information to Indeck, breaching Article 8(b) of the Master Contract; (2) Equistar controlled Indeck's subcontractors, breaching Article 16 of the Master Contract; and (3) Equistar cannot recover support-labor costs.  The court addresses each argument in turn.  None bars Equistar from recovering its damages.

**(1)      Article 8(b) of the Master Contract**

Indeck argues that Article 8(b) makes Equistar's prompt providing of information about its warranty claims to Indeck a condition precedent to Equistar's right to reimbursement, and that Equistar did not satisfy that condition, precluding its recovery for breach of warranty.  "A condition precedent is 'an event that must happen or be performed before a right can accrue to enforce an obligation.'"  *Conn Credit I, L.P. v. TF LoanCo III, L.L.C.*, 903 F.3d 493, 500 (5th Cir. 2018) (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998)).  "In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract.   In order to make performance specifically conditional, a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included."  *Id.* (quoting *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010) (citations omitted)).

The record evidence and testimony do not establish that Article 8(b) contains a condition precedent or other duty that Equistar breached.  Article 8(b) does not use conditional terms.  It does not say that Equistar cannot get reimbursement if it fails to "promptly" attempt to resolve disputes with Indeck.  Indeck has not identified any part of the Master Contract showing that the parties intended to condition Equistar's right of reimbursement on how promptly or thoroughly Equistar conveys its dispute to Indeck.  Nor does the record reflect a failure on Equistar's part to provide information or documents to Indeck to attempt dispute resolution.  This argument is not a bar to Equistar's recovery.  Because Article 8(b) is not a condition precedent, it does not bar Equistar's claim for damages.

### (2)    Article 16 of the Master Contract

Indeck asserts that Equistar cannot recover its damages for the fuel-gas skid or the water bridles because, in investigating and repairing those issues, Equistar controlled Indeck's subcontractors, breaching Article 16.  (Docket Entry No. 44 at 37–41).  Under Article 16, Equistar may have significant involvement with an Indeck subcontractor, including directing or controlling the "results to be obtained."  (Equistar Exh. 7).  Contrary to Indeck's assertion, Article 16 does not state that Equistar cannot recover damages for Indeck's breaches of warranty if Equistar exercises some control over Indeck's subcontractors in addressing the breaches, even beyond that described in Article 16.  Indeck is not asserting a claim for breach of any contract provision, including Article 16.  Indeck warranted that the materials it or its subcontractors supplied to Equistar would be of good quality and free of defects.  (*Id.*).  When Equistar received the fuel-gas skid, forced-draft fan, and water bridles, they did not meet that standard.  The costs of investigating and fixing

the defects resulted from the actions or inactions of Indeck's subcontractors before Equistar exercised such control over them as to affect its right to recover.[9]

**(3)**      **Support-Labor Costs**

Indeck alleges that the March 2017 purchase order for field-technician service is governed by Indeck's Domestic Field Service Rate Sheet, which includes the following "Support Labor" clause:

> All labor including, but not limited to, standby labor, initial check-out, start-up, and testing required to assist the Field Service Consultant at any time, shall be supplied by [Equistar] at no cost to Indeck.

(Equistar Exh. 33).  Indeck asserts that the Rate Sheet modified the Master Contract and that the support-labor clause precludes Equistar from recovering much of its damages.

The Rate Sheet did not modify the Master Contract.  Article 2 of the Master Contract states that purchase orders cannot modify the contract.  Article 2 also states that Indeck would provide materials and services "as generally set forth in the Scope of Supply described in [Indeck's] Quotation dated November 16, 2015."  (Equistar Exh. 7).  That "Scope of Supply" included field-technician service.  (Equistar Exh. 6 at 13).  Article 2 also states that:

> [i]t is the understanding of the Parties, that [Equistar] will issue a [purchase order] to [Indeck] for the purchase of specified Materials and/or the performance of Services. [Indeck] shall not supply any Materials and/or Services prior to Buyer's issuance of a [purchase order] for the Materials or Services. The [purchase order] issued under this Contract will be subject to and incorporate the terms and conditions of this Contract. [Equistar's] fulfillment of its obligations under the [purchase order] shall not be considered complete until all required documentation has been received, reviewed, and accepted by Buyer.

(Equistar Exh. 7) (emphasis added).  In line with Article 2, Equistar sent Indeck a purchase order for field-technician services.  That purchase order was governed by the Master Contract.  The Rate

---

[9]   The record fails to support Indeck's argument that its subcontractor, VEGA, ceased being its subcontractor after VEGA's bridles were delivered.  Regardless, Article 16 of the Master Contract does not preclude Equistar's recovery.

Sheet did not modify the Master Contract, and the Rate Sheet's support-labor clause does not preclude Equistar from recovering damages.

The court concludes that Indeck is liable to Equistar for breach of warranty, in the amount of $313,861, based on the forced-draft fan ($179,795), the fuel-gas skid ($40,101), and the water bridles ($93,965).

### b.   Excessive Vibration

The parties agree that Indeck sold the forced-draft fan, burner, and ductwork to Equistar. The court has found that the boilers vibrated excessively due to defects with that equipment, that the defects breached Indeck's warranties, and that the defects caused Equistar to incur damages. The only disputed issue is whether Equistar provided timely notice of the defects.   Equistar asserts three theories of notice: (1) that the defects were found at start-up and are covered by Article 13(a)(iii)(A) of the Master Contract; (2) that Indeck had actual, nonwritten notice of the defects before the warranty periods in Article 13(a)(iii)(B) and 13(v) expired; and (3) that the excessive-vibration defects are subject to a "reasonable" notice requirement under Texas law and that Indeck's actual notice was reasonable.

### (1)   Article 13(a)(iii)(A) of the Master Contract

Article 13(a)(iii)(A) provides a warranty for material defects found at start-up, with "start-up" defined as "the first fire or flue gas in the Materials." (Equistar Exh. 7).  The parties dispute whether the excessive-vibration issue was found at start-up.  The court finds that start-up occurred in July 2017, when, as Maureen Radi and Bob Swanton credibly testified, Maurice Mockler conducted the "first fire." (*See* Indeck Exh. 11 (Mockler's timesheet)).  The record evidence and testimony show that the excessive-vibration issue was not evident and did not arise at the July 2017 start-up.  Although the forced-draft fan's vibration was discussed at start-up, that did not

address the problem of both boilers vibrating excessively.  That problem was not identified until late 2017.  Perry Danniger Smith and Michael Holt credibly testified that they first discussed the vibration issue in late 2017 with Maurice Mockler and Bob Swanton.  The boilers' excessive vibration was not a problem that would be, or was, found at start-up, and did not trigger Article 13(a)(iii)(A).

### (2)      Article 13(a)(iii)(B) and 13(v) of the Master Contract

Article 13(a)(iii)(B) and 13(v) provide warranties for material defects found during the materials warranty period.  Indeck-manufactured equipment, including the main boiler components, are subject to Article 13(a)(iii)(B).  Under that warranty, if Equistar notifies Indeck of a material defect within 15 days of discovering the defect and within the material's warranty period, Indeck must repay Equistar the purchase price of the defective material or repair and replace it.  The warranty period provided in Article 13(a)(iii)(B) expires on the earlier of three dates:

- 24 months after delivery, which was in June 2016, making the expiration in June 2018;

- 24 months after Indeck offered to ship the equipment, which was April 2016, if the shipment was delayed through "no fault" of Indeck, making the expiration in April 2018; or

- 18 months after start-up, which was in July 2017, making the expiration in January 2019.

(Equistar Exh. 7).  The materials warranty for the main boiler components expired in June 2018, because:  (1) Indeck delayed the boilers' shipment, making the April 2018 expiration inapplicable; and (2) the warranty expired on the earlier of June 2018, 24 months after the boilers were delivered, and January 2019, 18 months after start-up.

Because an Indeck subcontractor manufactured the forced-draft fans and ducting, the warranty for those components is governed by Article 13(v), which states that the warranty applies

for "a minimum of twelve (12) months from Start-up," but does not "exceed 18 months from delivery or offer to ship if shipment is delayed by no fault of [Indeck]." (Equistar Exh. 7). The fans and ducting were delivered in September 2016. Start-up was in July 2017. There is a conflict as to whether the warranty for the Indeck-subcontractor-manufactured components expired in July 2018, 12 months after start-up, or March 2018, 18 months after delivery. Even if the warranties continued until July 2018, the timeliness of Equistar's notice of the vibration issue remains an issue.

Indeck asserts that, because Equistar did not send Indeck written notice of its warranty claim based on excessive vibration until October 2018, months after the July 2018 warranty expiration date, Indeck is not liable for the costs of investigating or repairing the issue. Equistar asserts that, because Indeck's service technicians knew of the vibration issue in late 2017 and early 2018, before the warranties expired, Indeck had timely and reasonable notice.

Article 13(iv) of the Master Contract provides:

iv. In the event that [Equistar] has provided written notice to [Indeck] and [Equistar] and [Indeck] mutually agree that it is a warranty claim that the Materials are defective within the Materials Warranty Period, and [Indeck] fails to promptly begin repair or replace any such defective Materials, [Indeck] agrees that [Equistar] will be entitled to repair or replace the Materials. In such case, [Indeck] agrees to reimburse [Equistar] for [Equistar's] reasonable direct cost to repair or replace the defective Materials. With regard to remedial services required by [Indeck] to repair or replace defective Materials during the Warranty Period, [Indeck] shall be responsible for the cost of all materials, equipment, and labor to repair or replace the defective Materials incurred or performed by [Indeck] or it Subcontractors to repair or replace the defective materials.

(Equistar Exh. 7).

Article 24 of the Master Contract provides:

24. Notice. Except as otherwise provided herein, any and all notices, consents, or other communications between the Parties, in order to be effective, shall be in writing and shall be sent via personal delivery, e-mail, fax, or by Federal Express or similar overnight service, by first class certified mail, return receipt requested, to the [parties'] addresses . . .

(Equistar Exh. 7).  Article 13(a)(iii)(B) requires Equistar to notify Indeck of material defects, and Article 24 requires that, except as "otherwise provided," notice of defects be in writing.  Although Indeck's service technicians were aware of the vibration issue in late 2017, Equistar did not send written notice until October 2018, after the warranties had expired.   Equistar's earlier communications to Indeck on this issue were oral.  Indeck's oral notice was insufficient under the Master Contract.

The court finds and concludes that Equistar did not provide timely written notice of the excessive-vibration defects before the warranties provided in Article 13(a)(iii)(B) and 13(v) expired.

### (3)   Reasonable Notice Under Texas Law

Equistar asserts that it was not required to give written notice of the excessive-vibration defects to Indeck under Article 13(a)(iii)(B).  Equistar argues that Article 13(a)(iii)(B) does not apply to those defects, because Indeck's service technicians were at Equistar's Tuscola plant when the defects were discovered, and Article 13(a)(iii)(B) applies "[d]uring the Material's Warranty Period and at Start-Up (as defined in 13-a-iii-A . . .) if [Equistar] does not use [Indeck's] Service Technician."  (Docket Entry No. 43 at 28; Equistar Exh. 7).  Because Equistar did use Indeck's service technicians during the material's warranty period, Equistar asserts that the written-notice requirement of Article 13(a)(iii)(B) does not apply.  Instead, the Texas Business and Commercial Code's gap-filler requirement of "reasonable" notice applies.  (Docket Entry No. 43 at 28–29); *see* TEX. BUS. & COMM. CODE § 2.607(c)(1) ("[a] buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy").  Because Indeck's service technicians knew of the excessive-vibration issue in late 2017 and early 2018, Equistar asserts, Indeck had reasonable notice.

The qualifier "if [Equistar] does not use [Indeck's] Service Technician" applies only to "at Start-Up," and not to "the Material's Warranty Period."  Article 13(a)(iii)(B) does not condition its notice requirement on the lack of an Indeck service technician throughout the warranty period. Rather, Article 13(a)(iii)(B) states that if a material defect is discovered during either (a) the "Material's Warranty Period" or (b) at start-up if Equistar does not use an Indeck service technician, then the 15-day written notice requirement applies.

This reading is supported by Article 13(a)(iii)(A), which warrants material defects discovered at start-up if Equistar used Indeck's service technician at start-up.  Article 13(a)(iii)(A) states that "[i]f [Equistar] does not use [Indeck's] Service Technician at the Start-Up, the [warranty in Article 13(a)(iii)(A)] will not apply, and [Equistar's] remedies for a defect in the Product found at Start-Up will be limited to the remedies set forth below in 13-a-iii-b."  (Equistar Exh. 7). Article 13(a)(iii)(B)'s reference to Equistar not using Indeck's service technician naturally follows Article 13(a)(iii)(A)'s carve-out.  The Master Contract does not support conditioning the notice requirement of the "Material's Warranty Period" on the use or non-use of an Indeck service technician.

Equistar's proposed interpretation is also inconsistent with Article 24, which requires all communications and notices between the parties to be in writing to be effective.  Allowing nonwritten notice of material defects contradicts Article 24's broad written-notice requirement. Equistar presents no evidence or testimony that showing that the parties intended such a substantial exception to Article 24.

The context of the parties' transaction supports applying the written-notice requirement here.  The record evidence shows that Equistar and Indeck initially agreed to have Indeck's service technician at the Tuscola plant for 36 days.  The "Material's Warranty Period" provided in

Article 13(a)(iii)(B) lasts between 18 and 24 months.  Article 13(a)(iii)(B) sets out a requirement for notifying Indeck after its service technicians have left.  The fact that Indeck's service technicians remained on site long after the parties intended does not change the meaning of the contract terms the parties signed.

Equistar presented no record evidence or testimony in support of its assertion that Article 13(a)(iii)(B)'s notice requirement does not apply to the excessive-vibration defects.  In light of Article 13(a)(iii) and Article 24, and the context of the parties' Maseter Contract, the court finds and concludes that the material-defects warranty in Article 13(a)(iii)(B) applied to the excessive-vibration defects.  As discussed above, Equistar was required to provide timely written notice of the defects, which it did not do.

Indeck is not liable to Equistar for breach of warranty based on the boilers' excessive vibration.

## 2.    Breach of Contract

Indeck is liable for breach of contract if:  (1) a valid contract exists; (2) Equistar performed its contractual obligations; (3) Indeck failed to perform its contractual obligations; and (4) Equistar suffered damages due to Indeck's failure.  *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

The parties agree that the Master Contract is a valid contract and that Equistar performed its contractual obligations by paying Indeck's invoices.  The dispute is whether Indeck failed to perform its contractual obligations, causing Equistar's damages.

### a.    Excessive Rework by Maurice Mockler and Bob Swanton

Article 13(w)(i) of the Master Contract states that "[Indeck] and its Subcontractors agree to . . . provide Materials and Services in a good, efficient and safe manner."  (Equistar Exh. 7).

Indeck and Equistar initially planned for Maurice Mockler to work for 36 days.  It took Maurice Mockler and Bob Swanton 186 nonconsecutive days to make the boilers operational.  Equistar asserts that Indeck breached its contractual promise to provide services in an efficient manner, because Mockler and Swanton had to do excessive work.

The Master Contract does not define "efficient."  Under Texas law, it is given its "generally accepted or commonly understood meaning."  *Frederking v. Cincinnati Ins. Co.*, 929 F.3d 195, 197 (5th Cir. 2019) (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007)); *Nichols v. Enterasys Networks, Inc.,* 495 F.3d 185, 190 (5th Cir. 2007) ("undefined contract terms are generally given their plain, ordinary, and generally accepted meanings").  It is generally understood that something is "efficient" if it produces a desired outcome within a reasonable and usual or customary time, and within reasonable and usual or customary efforts.  Although the parties' plan to get the boilers up and running in 36 days was an estimate, the need for 150 more workdays shows that Indeck did not provide efficient services.  Indeck's service technicians spent many days fixing problems that should not have occurred, or that should have been addressed before delivery, or that were improperly addressed and had to be redone by other service technicians.  The court concludes that Indeck materially breached Article 13(w)(i) of the Master Contract by providing inefficient services.

Indeck is liable to Equistar for breach of contract based on excessive rework, in the amount of $286,998.[10]

---

[10]   Indeck asserts that Equistar cannot recover its damages because Equistar breached Article 8(b) of the Master Contract and because Equistar cannot recover support-labor costs.  (Docket Entry No. 44 at 22–23, 45–50).  As discussed above, neither of those bars Equistar from recovering its damages.

**b.      Railcar Rental Charges**

Equistar asserts that, by not releasing customs paperwork for the boilers and delaying the boilers' delivery by one month, Indeck materially breached Article 13(w)(i) of the Master Contract because it provided inefficient transportation services. The court has found that Indeck delayed delivery. Indeck materially breached Article 13(w)(i) by providing inefficient transportation services and is liable to Equistar for one month of railcar rental fees, in the amount of $44,000.

**3.      Professional Negligence**

Indeck is liable for negligence if: (1) it owed a legal duty to Equistar; (2) it breached the duty; and (3) the breach proximately injured Equistar. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Indeck, as the boiler designer and engineer, is subject to a professional's standard of care. A professional's standard of care is defined as what a professional of ordinary prudence in that field would or would not have done under the same or similar circumstances. *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 919 (Tex. App.—Houston [1st Dist.] 1993), *aff'd as modified*, 901 S.W.2d 434 (Tex. 1995). Equistar asserts that Indeck negligently designed the boiler system, resulting in excessive boiler vibration. (Docket Entry No. 47 at 4).

Indeck asserts that Equistar's negligence claim is barred by the economic-loss rule. "Under the economic-loss rule, if a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract, he cannot maintain a tort action against a defendant." *Sterling Chemicals, Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)). The rule "preclude[s] tort claims brought to recover economic losses against the manufacturer or seller of a defective product where the alleged defect damages only the product and does not cause 'personal injury'

or damage to 'other property.'"  *Id.* at 796 n.3 (quoting *Pugh v. General Terrazzo Supplies, Inc.*, 243 S.W.3d 84 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

Equistar asserts that its professional-negligence claim is based in part on damage to property other than the boilers caused by the boilers' excessive vibration, overcoming the economic-loss rule.  (Docket Entry No. 43 at 26).  Equistar's excessive-vibration damages are set out in a spreadsheet that Perry Danniger Smith prepared.  (Equistar Exh. 30).  Danniger Smith credibly testified that he based the costs on repairs Equistar made to investigate, find, and fix the vibration.  Michael Holt testified that the boilers' vibration damaged other Equistar property besides the boilers, but those damages are not listed in Smith's spreadsheet.  Aaron McKee's May 2019 demand letter to Greg Wassilkowsky identifies the excessive-vibration damages as the cost of repairing the damage to the boilers.  (Equistar Exh. 19).  The record evidence and testimony do not show that Equistar seeks damages for repairing property besides the boilers themselves. Although the damages could be recoverable under breach-of-contract or breach-of-warranty claims, the court concludes that the economic-loss rule precludes recovery of these damages under Equistar's professional-negligence claim.

Indeck is not liable to Equistar for professional negligence.

### 4.     Attorneys' Fees

Equistar asserts that it is entitled to attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code.  (Docket Entry No. 1 at ¶ 33).  To recover attorneys' fees, Equistar must show that:  (1) its claims are based on an identified category, such as "rendered services," "furnished material," or a "written contract"; (2) Equistar was represented by attorneys; (3) Equistar presented its claims to Indeck; and (4) Indeck did not pay Equistar's claims within 30 days after Equistar presented them.  Tex. Civ. Prac. & Rem. Code §§ 38.001, 38.002.

Equistar is entitled to attorneys' fees.  Its claims were based on a written contract, furnished materials, and services.  Equistar was represented by attorneys.  Equistar presented its claims to Indeck in May 2019, (Equistar Exh. 19), and Indeck did not pay Equistar's claims within 30 days. *See Hood v. CIT Bank, NA,* No. 14-18-00496-CV, 2021 WL 629751, at *6–7 (Tex. App. Feb. 18, 2021) (discussing the requirements for recovering attorneys' fees).

## III.    Order

Consistent with the court's findings of fact and conclusions of law, the court will issue judgment, in accordance with Federal Rule of Civil Procedure 58.  The total damage award in favor of Equistar is **$644,859.**  Equistar is entitled to recover prejudgment and postjudgment interest.

No later than **April 1, 2021**, Equistar is to submit a proposed final judgment, consistent with these findings and conclusions.  Equistar may submit proof of its attorneys' fees in accordance with Rule 54 of the Federal Rules of Civil Procedure.

SIGNED on March 24, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge